UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JILL STEIN and LOUIS NOVAK,

      Plaintiffs,

No. 2:16-cv-14233-MAG-EAS

v.

CHRISTOPHER THOMAS, in his official
capacity as Director of Elections; and
JEANETTE BRADSHAW, NORMAN D.
SHINKLE, JULIE MATUZAK, and COLLEEN
PERO, in Their Official Capacities as Members
of the Board of State Canvassers,

      Defendants.

_____/

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR A
TEMPORARY RESTRAINING ORDER AND A PRELIMINARY INJUNCTION
ENJOINING THE DELAY OF THE STATEWIDE RECOUNT OF THE 2016
PRESIDENTIAL ELECTION**

Goodman Acker P.C.
17000 West Ten Mile, Second Floor
Southfield, Michigan 48075
(248) 483-5000

TABLE OF CONTENTS

PAGE NO.

TABLE OF AUTHORITIES ............................................................................... iii-iv

PRELIMINARY STATEMENT ............................................................................ 1

FACTS ................................................................................................................. 2

I.     PLAINTIFF JILL STEIN REQUESTS A STATEWIDE RECOUNT IN
MICHIGAN IN LIGHT OF UNPREDECENTED INDICATIONS OF
INTERFERENCE IN THE 2016 PRESIDENTIAL ELECTION........................ 2

II.    DEFENDANTS POSTPONE THE START OF THE STATEWIDE RECOUNT
UNDER A NEWFOUND INTERPRETATION OF SECTION 166.822 ............... 3

III.   DEFENDANTS' INTERPRETATION OF SECTION 166.882 WILL
DISENFRANCHISE MICHIGAN IN THE ELECTORAL COLLEGE ................ 4

ARGUMENT ....................................................................................................... 4

I.     PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS ..................... 5

    A.   Delaying the Statewide Recount Violates the Constitutional Rights of Michigan
Voters ...................................................................................................... 5

        1.   Section 166.882 as Applied Violates the Equal Protection Clause....................... 5

        2.   Section 166.882 as Applied Violates the Due Process Clause............................. 6

        3.   Section 166.882 as Applied Violates the Right to Vote......................................... 7

    B.   Delaying the Recount Violates Stein's and Voters' Rights to Have Votes Counted
Meaningfully in a Process Free from Fraud or Tampering ................................ 9

        1.   Vulnerability to Cyber Attack ........................................................................ 10

        2.   Foreign Cyberattackers Apparently Sought to Effect the 2016 Election Outcome 12

        3.   The Number of Ballots Discarded as Undervotes Raises Grave Concerns that the
Certified Results are Inaccurate .................................................................. 13

        4.   A Recount is Necessary to Restore Confidence in Michigan's Election Results
and Safeguard Its Citizens' Right to Have their Votes Counted............... 14

II.    PLAINTIFFS WILL SUFFER IRREPARABLE HARM IN THE ABSENCE OF
PRELIMINARY RELIEF .............................................................................. 16

III.   PRELIMINARY RELIEF WILL NOT HARM OTHERS ........................................ 17

17000 WEST TEN MILE ROAD, SECOND FLOOR • SOUTHFIELD, MICHIGAN 48075 • PHONE 248.483.5000 • FAX 248.483.3131

GOODMAN ACKER P.C.
Detroit's Trusted Law Firm®

i

IV.    ENJOINING UNNECESSARY DELAY OF THE RECOUNT SERVES THE
       PUBLIC INTEREST ...................................................................................... 18

V.     THE COURT SHOULD NOT REQUIRE A BOND ............................................ 18

CONCLUSION ............................................................................................................. 19

### TABLE OF AUTHORITIES

**Cases**

*Anderson v. Celebrezze,*
    460 U.S. 780 (1983) ........................................................................... 7, 9

*Bryanton v. Johnson,*
    902 F. Supp. 2d 983 (E.D. Mich. 2012) ........................................... 18

*Burdick v. Takushi,*
    504 U.S. 428 (1992) ............................................................................ 7

*Bush v. Gore,*
    531 U.S. 98 (2000) .......................................................................... 4, 6

*Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.,*
    511 F.3d 535 (6th Cir. 2007) ............................................................. 5

*Cole v. ArvinMeritor, Inc.,*
    516 F. Supp. 2d 850 (E.D. Mich. 2005) ........................................... 18

*Connection Distribution Co. v. Reno,*
    154 F.3d 281 (6th Cir. 1998) ............................................................. 5

*Déjà Vu of Nashville, Inc. v. Metropolitan Gov't of Nashville & Davidson County,*
    274 F.3d 377 (6th Cir. 2001) ........................................................ 5, 18

*Dunn v. Blumstein,*
    405 U.S. 330 (1972) ............................................................................ 8

*Elrod v. Burns,*
    427 U.S. 347 (1976) .......................................................................... 16

*Hadley v. Jr. College Dis. of Metro. Kansas City,*
    397 U.S. 50 (1970) .............................................................................. 9

*Harper v. Va. State Bd. of Elections,*
    383 U.S. 663 (1966) ............................................................................ 8

*Hunter v. Hamilton Cnty. Bd. of Elec.,*
    635 F.3d 219 (6th Cir. 2011) ........................................................... 17

*Jones v. City of Monroe,*
    341 F.3d 474 (6th Cir. 2003) ............................................................. 5

*League of Women Voters of Ohio v. Brunner,*
    548 F.3d 463 (6th Cir. 2008) ...................................................... 5, 6, 9

iii

17000 WEST TEN MILE ROAD, SECOND FLOOR • SOUTHFIELD, MICHIGAN 48075 • PHONE 248.483.5000 • FAX 248.483.3131 •

GOODMAN ACKER P.C.
Detroit's Trusted Law Firm

*Miller v. Blackwell*,
    348 F. Supp. 2d 916 (S.D. Ohio 2004)................................................................17

*Moltan Co. v Eagle-Picher Indus., Inc.*,
    55 F.3d 1171 (6th Cir. 1995)......................................................................18

*Moore v. Ogilvie*,
    394 U.S. 814 (1969) ...................................................................................6

*Newsom v. Norris*,
    888 F.2d 371 (6th Cir. 1989) ......................................................................5

*Obama for Am. v. Husted*,
    697 F.3d 423 (6th Cir. 2012)................................................................8, 16

*Ohio Republican Party v. Brunner*,
    544 F.3d 711 (6th Cir. 2008)........................................................................5

*Overstreet v. Lexington-Fayette Urban County Gov't*,
    305 F.3d 566 (6th Cir. 2002)......................................................................16

*Purcell v. Gonzalez*,
    549 U.S. 1 (2006) ......................................................................................18

*South v. Peters*,
    339 U.S. 276 (1950) ...................................................................................7

*Stewart v. Blackwell*,
    444 F.3d 843 (6th Cir. 2006).......................................................................8

*Sw. Voter Registration Educ. Project v. Shelley*,
    344 F.3d 882 (9th Cir. 2003)......................................................................17

*Touchston v. McDermott*,
    234 F.3d 1133 (11th Cir. 2000) .................................................................16

*Warf v. Bd. of Elections of Green County*,
    619 F.3d 553 (6th Cir. 2010) ......................................................................6

*Williams v. Salerno*,
    792 F.2d 323 (2d Cir. 1986) ......................................................................17

**Statutes**

3 U.S.C. § 5 ........................................................................................................4

Mich. Comp. Laws § 168 ...........................................................................*passim*

## PRELIMINARY STATEMENT

To ensure that the voices of Michigan's people will be heard and their votes counted in the 2016 Presidential election, Michigan must complete a recount of votes by December 13, the federally imposed deadline for the selection of electors to the Electoral College. Today, the Michigan Board of State Canvassers and Christopher Thomas, Director of Elections, announced that they would not begin the recount until two full business days and four calendar days have passed, even though all objections to the recount petition have now been resolved. That decision threatens to render the recount pointless insofar as Michigan's actual participation in the 2016 presidential election is concerned.

Now that the only objections to the petition have been resolved, Defendants have no legitimate interest in waiting until Wednesday to begin counting, especially in the face of the ticking Electoral College clock. The unavoidable effect of the delay is to make completing the recount before the Electoral College meets even more difficult. The recount was ready to begin today, but Donald Trump's campaign sought, by any means necessary, to halt the recount, interposing "objections" on such matters as whether the petition was properly notarized, whether Jill Stein—never mind the *voters*—is sufficiently "aggrieved" by the results, and, most ironically, whether there is time to finish the count. The objections were rejected today by the Board, and the recount should now begin and proceed over the weekend.

The refusal of Michigan's election apparatus to proceed with the recount now, when it can still make a difference, is plainly designed to block a meaningful and impactful audit of an electronic vote tabulating system that, according to every leading expert, is frighteningly vulnerable to hacking and unreliable unless checked against readily available paper records—citizens' ballots. The effect of this move is to deny Michiganders, and all

Americans, a full accounting of the truth about what happened in this critical election, and a voice in the Electoral College.

Only this Court can prevent process from overwhelming substance, and delay from defeating justice. Presidential candidate Jill Stein petitions this Court for an immediate order directing Michigan Director of Elections and the State Board of Canvassers to commence the recount *now* as it had already arranged to do and to thereby seek to ensure the integrity of our election in a timely way. In Michigan this year, numerous anomalies in the voting suggest that the election may have been hacked. We need to know the truth, and the truth needs to matter. This Court should direct that the recount proceed immediately.

## FACTS

**I.    PLAINTIFF JILL STEIN REQUESTS A STATEWIDE RECOUNT IN MICHIGAN IN LIGHT OF UNPREDECENTED INDICATIONS OF INTERFERENCE IN THE 2016 PRESIDENTIAL ELECTION**

On November 30, 2016, Jill Stein filed a petition seeking a statewide recount of the 2016 Presidential Election. *See* Declaration of Mark Brewer ("Brewer Decl.") Ex. 1. As Dr. Stein recognizes, there is reason to believe that sufficient votes in Michigan for president may have been miscounted, possibly to change the results, as a result of large-scale hacking and/or malfunction of the optical scan machines used to tabulate ballots in every county in the state. Fortunately, Michigan law provides a mechanism for restoring confidence and correcting any disenfranchisement of voters: that mechanism is a statewide recount.

When a candidate files an adequate petition for a recount in Michigan, absent any valid objections to its form, that recount *must* proceed as long as the candidate wishes until a new result is certified. Accordingly, on November 28, 2016, anticipating Dr. Stein's petition, the State Board of Canvassers prepared for a recount that was to begin this morning. Brewer Decl. ¶ 3. The Bureau of Elections has already undertaken to obtain central locations in which

2

the recount can take place, to arrange for secure transportation of the ballots, and to train its staff throughout the state to efficiently and accurately count every presidential vote cast in a matter of days. *Id.* ¶ 5 & Ex. 2. The Bureau planned to proceed with the recount from 9 a.m. to 8 p.m. every day, including weekends, and Thomas expressed his confidence that the schedule could ensure completion of the recount by December 13.

## II.   DEFENDANTS POSTPONE THE START OF THE STATEWIDE RECOUNT UNDER A NEWFOUND INTERPRETATION OF SECTION 166.822

However, the Thomas abruptly reversed course yesterday, when candidate Donald J. Trump filed a set of objections aiming to slow down the State's momentum and delay the recount. *Id.* ¶ 8 & Ex. 3.  Thomas promptly announced that he was cancelling the recounts scheduled to begin today pending a Board hearing on the objections that took place this morning. *Id.* ¶ 9.  The Board held its hearing this morning, December 2, and rejected the Trump campaign's objections. *Id.* ¶ 10.   Even though the Board swiftly rejected Mr. Trump's frivolous objections, it concluded that the recount could not begin until two business days elapse from the time of its decision—the evening of Tuesday, December 6, or the morning of Wednesday, December 7. *Id.* ¶ 11.  Thomas relied on Michigan Comprehensive Law § 166.882(3), which reads, in part, "The board of state canvassers shall not begin a recount unless two or more business days have elapsed since the board ruled on the objections under this subsection, if applicable." *Id.* ¶ 12.  Mr. Thomas stated his intention to start the recount on Tuesday evening or, more likely, Wednesday morning, based on this directive—but, critically, he could not assure the Board that a recount starting then would be completed before the December 13th Electoral College deadline. *Id.*

3

III.   **DEFENDANTS' INTERPRETATION OF SECTION 166.882 WILL DISENFRANCHISE MICHIGAN IN THE ELECTORAL COLLEGE**

If Michigan does not recommence its recount immediately, and the count is not completed on or before December 13, the date by which presidential electors must be chosen, the presidential votes of every single one of Michigan's nearly 5 million voters may be nullified.  According a complaint filed by Michigan's Attorney General today in the Michigan Supreme Court, "[i]f Michigan . . . does not resolve a dispute as to its electors . . . by this 'safe harbor' date, . . . Michigan is then at risk of having its electors . . . completely rejected." *Id.* ¶ 30 & Ex. 17.

Here, if applied as Defendants have proposed, § 166.882 threatens to make it impossible for Michigan to complete the recount to make a "final determination of any controversy or contest concerning the appointment of all or any of the electors" by December 13, the federal safe-harbor date for the selection of electors. 3 U.S.C. § 5.  The result will be the disenfranchisement of Michiganders in the Electoral College—and the erasure of *all* its citizens' votes—a result the Legislature could not possibly have intended. *See Bush v. Gore*, 531 U.S. 98, 113 (2000) (observing that "to respect the legislature's Article II powers" to select electors, courts should be careful not to "frustrate the legislative desire to attain the 'safe harbor' provided by § 5").

## ARGUMENT

"When considering a motion for preliminary injunction, a district court must [consider] . . . (1) whether the [Plaintiffs have] a strong likelihood of success on the merits; (2) whether the [Plaintiffs] would suffer irreparable injury without the injunction; (3) whether issuance of the injunction would cause substantial harm to others; and (4) whether the public interest would be served by the issuance of the injunction." *Certified Restoration Dry Cleaning*

4

*Network, L.L.C. v. Tenke Corp.*, 511 F.3d 535, 542 (6th Cir. 2007).  The same factors govern

issuance of a temporary restraining order.  *Ohio Republican Party v. Brunner*, 544 F.3d 711,

730-36 (6th Cir. 2008) (vacated on other grounds).

These are "factors to be balanced, not prerequisites that must be met . . . [and] a

district court is not required to make specific findings concerning each of the four factors . . . if

fewer factors are dispositive of the issue." *Jones v. City of Monroe*, 341 F.3d 474, 476 (6th Cir.

2003) (internal citations omitted).  For example, in cases like this, which involve constitutional

violations, "the likelihood of success on the merits often will be the determinative factor,"

*Connection Distribution Co. v. Reno*, 154 F.3d 281, 288 (6th Cir. 1998), because "even

minimal infringement upon [constitutional] values constitutes irreparable injury sufficient to

justify injunctive relief," *Newsom v. Norris*, 888 F.2d 371, 378 (6th Cir. 1989).  Moreover,

where a likelihood of success on the merits is found, "no substantial harm to others can be said

to inhere in its enjoinment… and it is always in the public interest to prevent violation of a

party's constitutional rights." *Déjà Vu of Nashville, Inc. v. Metropolitan Gov't of Nashville &*

*Davidson County*, 274 F.3d 377, 400 (6th Cir. 2001) (internal quotation marks omitted).

I.     **PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS**

A.     **Delaying the Statewide Recount Violates the Constitutional Rights of**
       **Michigan Voters**

1.     **Section 166.882 as Applied Violates the Equal Protection Clause**

Section 166.882 violates the Equal Protection Clause because, as applied here, it

threatens to "arbitrarily deny [Michiganders] the right to vote depending on where they live."

*League of Women Voters of Ohio v. Brunner*, 548 F.3d 463, 476 (6th Cir. 2008).  "Having once

granted the right to vote on equal terms, the State may not, by later arbitrary and disparate

treatment, value one person's vote over that of another." *Bush*, 531 U.S. at 104-05 (per

curiam); *accord Brunner*, 548 F.3d at 476 ("The right to vote includes the right to have one's vote counted on equal terms with others.").

Such unequal treatment is precisely what will happen if insufficient time is allocated to a state-wide recount of nearly five million votes: Michigan voters will be treated unequally from voters in every other state whose statewide official election results will be ascertained prior to the safe-harbor date. They will be deprived of their voice in selecting the President.

Devaluing the votes of Michigans' citizens in this way violates equal protection principles recognized by decades of Supreme Court law. *See Moore v. Ogilvie*, 394 U.S. 814, 819 (1969) (systemic devaluation of votes cast in certain geographic areas violates the Fourteenth Amendment). Because delaying the recount as Defendants propose would run afoul of the "minimum requirement for nonarbitrary treatment of voters necessary to secure the fundamental right," *Bush*, 531 U.S. at 105, Section 166.882 as applied violates the Equal Protection Clause of the Fourteenth Amendment.

### 2.   Section 166.882 as Applied Violates the Due Process Clause

"The Due Process Clause is implicated, and § 1983 relief is appropriate, in the exceptional case where a state's voting system is fundamentally unfair." *Brunner*, 548 F.3d at 478. Needless delay in commencing Michigan's recount will result in "significant disenfranchisement and vote dilution," *Warf v. Bd. of Elections of Green Cnty*, 619 F.3d 553, 559 (6th Cir. 2010), violating the due process rights of Michiganders whose votes in the 2016 election go unheard in the Electoral College.

Millions of Michiganders voted on November 8 under the expectation that their votes would determine the electors who would cast votes for President and Vice President on their behalf in the Electoral College. *See* Mich. Comp. Laws §§ 168.43, 168.45, 168.46. The

6

Michigan Legislature created a recount process to ensure that those votes—and votes in all other elections—were accurately counted.  Reading a statutory scheme designed for all elections to unnecessarily delay a recount in the peculiar context of a presidential election until it is too late to complete it in time upends voters' and the Legislature's expectations and threatens to render the votes cast by citizens meaningless.  "There is more to the right to vote than the right to mark a piece of paper and drop it in a box or the right to pull a lever in a voting booth.  The right to vote includes the right to have the ballot counted." *South v. Peters*, 339 U.S. 276, 279 (1950) (Douglas, J., dissenting).  That principle applies here with full force: the only way to avoid nullifying the millions of votes cast on Election Day is to commence the required recount in time to complete it by December 13.

### 3.     Section 166.882 as Applied Violates the Right to Vote

"When a plaintiff alleges that a state has burdened voting rights through the disparate treatment of voters," federal courts review the claim "using the 'flexible standard'" outlined by the Supreme Court in *Anderson v. Celebrezze*, 460 U.S. 780 (1983), and *Burdick v. Takushi*, 504 U.S. 428 (1992).  Under that standard:

> A court considering a challenge to a state election law must weigh the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate against the precise interests put forward by the State as justifications for the burden imposed by its rule, taking into consideration the extent to which those interests make it necessary to burden the plaintiffs' rights.

*Burdick*, 504 U.S. at 434 (internal quotation marks omitted).  "This standard is sufficiently flexible to accommodate the complexities of state election regulations while also protecting the fundamental importance of the right to vote." *Obama for Am. v. Husted*, 697 F.3d 423, 429 (6th Cir. 2012).

17000 West Ten Mile Road, Second Floor  •  Southfield, Michigan 48075  •  Phone 248.483.5000  •  Fax 248.483.3131

GOODMAN ACKER P.C.
Detroit's Trusted Law Firm

Here, the State can offer no persuasive justifications for a two-day delay, and certainly not that outweigh the burden on Michiganders' voting rights occasioned by jeopardizing Michigan's ability to participate in the Electoral College and setting up the disenfranchisement of *all* of its voters.  There is no conceivable state justification for allocating more time to the objection process than to the entire recount itself, especially with full knowledge that doing so will almost certainly prevent the will of Michigan voters from being counted in the electoral college.  "All of the precedent indicates that having one's vote properly counted is fundamental to the franchise." *Stewart v. Blackwell*, 444 F.3d 843, 868 (6th Cir. 2006), *superseded on other grounds*, 473 F.3d 692 (6th Cir. 2007).

Michigan's interest in following an arbitrary timeline for resolving objections to a recount petition cannot overcome the fundamental rights of all Michigan voters to have their will registered in the national election for the highest office in the land, especially when that timeline, which was designed for elections generally and not adapted for the needs of the Electoral College, is misconstrued to invite frivolous objections designed solely to slow the process, and the unnecessary, inexplicable delay between  resolution of objections and any recount.  "[T]he right to vote is too precious, too fundamental to be so burdened or conditioned." *Harper v. Va. State Bd. of Elections*, 383 U.S. 663, 670 (1966).  Because "there are other, reasonable ways to achieve [Michigan's] goals with a lesser burden on constitutionally protected activity"— the most obvious one being to commence the recount immediately now that objections have been fully resolved—Michigan "may not choose the way of greater interference." *Dunn v. Blumstein*, 405 U.S. 330, 343 (1972).  Indeed, as the Supreme Court has held, "in the context of a Presidential election, state-imposed restrictions implicate a uniquely important national interest" because "the President and the Vice President of the

8

United States are the only elected officials who represent all the voters in the Nation."
*Anderson*, 460 U.S. at 795.   Accordingly, "the State has a less important interest in regulating
Presidential elections than statewide or local elections, because the outcome of the former will
be largely determined by voters beyond the State's boundaries."   *Id.*.

**B.      Delaying the Recount Violates Stein's and Voters' Rights to Have Votes
           Counted Meaningfully in a Process Free from Fraud or Tampering**

Proceeding with a recount now is the *only* way to ensure that votes have been
counted on equal terms throughout Michigan, and that votes for Dr. Stein and each of her
opponents have been recorded properly.   Michigan has adopted clear rules for the tabulation of
ballots: a vote is "considered valid [if] there is a mark within the predefined area" on a ballot,
unless it is "a stray mark." Mich. Comp. Laws § 168.799a(3).   But the public has every reason
to believe that, because of computer malfunction and/or malicious hacking, these standards
were disregarded in tallying a substantial number of votes—enough votes to change the
election's outcome.   Michigan's vulnerability to cyber attacks, the unprecedented foreign cyber
attacks this year, and striking numbers of undervotes raise grave concerns that voters
throughout the state have been arbitrarily stripped of the right "to have [their] vote[s] counted
on equal terms with others."   *Brunner*, 548 F.3d at 476.

Michigan law provides an answer to this threat to the voters' right "to have his
vote counted with substantially the same weight as that of any other voter," *Hadley v. Jr.
College Dis. of Metro. Kansas City*, 397 U.S. 50, 53 (1970).   It provides all candidates an
absolute right to seek recounts under rules designed to "accommodate those situations where
the tabulating equipment employed to count optical scan ballots cast at an election is unable to
recognize a properly cast vote" for whatever reason.   *See* Brewer Aff. Ex. 8 (Optical Scan
Procedures).

9

Paper records of every voter's choice—*i.e.*, the ballots themselves—have been carefully preserved according to strict chain of custody and security measures.  Meanwhile, because of their vulnerabilities, relying blindly on Michigan's optical scan machines—the computers used to read ballots and tabulate votes—is the equivalent of storing the ballots in an unlocked, unguarded building in the center of town with a neon sign reading "Ballots Here!" Michigan's recount system—enacted by the Legislature to guard its citizens' and candidates' Due Process and Equal Protection rights to have their votes counted—is well-designed, geared-up, and immediately prepared to verify whether the security of the optical scan machines was breached, and whether they malfunctioned to broadly disenfranchise Michigan's voters. Defendant's application of the two-business day waiting period—effectively four days here— threatens to stymie that effort—contrary to the Michigan Legislature's will and the federal Constitution—and must be stopped.

A recount of votes for president in the context of this election is essential to restoring confidence in the integrity of Michigan's election process and safeguarding its citizens' rights to have their votes counted on equal terms.

### 1.      Vulnerability to Cyber Attack

Computer science experts are united in their view that our nation's election systems are vulnerable to cyberattack, and Michigan no less than its sister states.   Richard Clarke, who served as the White House senior cybersecurity policy adviser under both Presidents Bill Clinton and George W. Bush, explained that there is "nothing to stop [election hacking] from happening in many parts of the country," and, in a "close election[], a little manipulation could go a long way."  Richard Clarke, *Yes, It's Possible to Hack the Election*, ABC News, Aug. 19, 2016, http://abcnews.go.com/Politics/hack-election/story?id=41489017. Michigan's election results are the closest in the country.

10

Experts have repeatedly documented in peer-reviewed and state-sponsored research that American voting machines have serious cybersecurity problems. Michigan's voting machines are computers with reprogrammable software. As Professor Rivest from the Massachusetts Institute of Technology explains: "We have learned the hard way that almost any computer system can be broken into by a sufficiently determined, skillful, and persistent adversary. There is nothing special about voting systems that magically provides protection against attack." Affidavit of Ronald L. Rivest ("Rivest Aff.") ¶ 8. An attacker who can modify that software by infecting the machines with malware can cause the machines to provide any result of the attacker's choosing. In just a few seconds, anyone can install vote-stealing malware on a voting machine that silently alters the electronic records of every vote. *See* Affidavit of J. Alex Halderman ("Halderman Aff.") ¶ 10. Practically speaking, it is not possible to determine with certainty the absence of malicious software hiding within what might appear to be many thousands of lines of legitimate software code. *See* Affidavit of Poorvi L. Vora ("Vora Aff.") ¶ 13.

Whether voting machines are connected to the Internet is irrelevant. Sophisticated attackers such as nation-states have a developed a variety of techniques for attacking non-Internet-connected systems. Shortly before each election—after the candidates have been chosen—poll workers copy the ballot design from a regular desktop computer in a government office (or at a company that services the voting machines) and use removable media (akin to the memory card in a digital camera) to load the ballot design onto each machine. Halderman Aff. ¶ 11. That initial computer is almost certainly not well enough secured to guard against attacks by foreign governments. *Id.* If technically sophisticated attackers infect that computer, they can spread vote-stealing malware to every voting machine

11

in the area. *Id.* Most voting machines also have reprogrammable software ("firmware") that can in many cases be manipulated well in advance of the election to introduce vote-sealing malware. *Id.* Technically sophisticated attackers can accomplish this with ease. *Id.*; *see also* Affidavit of Dan S. Wallach ("Wallach Aff.") ¶ 7 ("Combine the patience and resourcefulness of a nation-state adversary with the unacceptably poor state of security engineering in our voting systems," and it becomes "entirely reasonable to consider attacks against our voting systems to be within the feasible scope of our adversaries' capabilities"); Affidavit of Harri Hursti ("Hursti Aff.") ¶¶ 6-22 (detailing various attack vectors to which optical scan voting systems are vulnerable).

While the vulnerability of American voting machines have been known for some time, states' responses to these vulnerabilities have been patchy and inconsistent at best. Many states, including Michigan, continue to use machines that are known to be insecure. Halderman Aff. ¶ 12. Specifically, the Accuvote OS scanners used in Michigan have "demonstrated vulnerabilities to several hacks," Affidavit of Douglas W. Jones ("Jones Aff.") ¶ 28, and can be "tampered within in a matter of minutes . . . using only off-the-shelf equipment," Vora Aff. ¶ 25.

### 2.   Foreign Cyberattackers Apparently Sought to Effect the 2016 Election Outcome

This year's election cycle is unprecedented. This is the first time in United States history that foreign operators hacked American computers in an apparently attempt to interfere with the presidential election. This summer, attackers broke into the email system of the Democratic National Committee and, separately, into the email account of John Podesta, the chairman of Democratic Party candidate Hillary Clinton's campaign. The attackers leaked private messages from both hacks. Attackers also infiltrated the voter registration systems of

12

two states, Illinois and Arizona, and stole voter data. The Department of Homeland Security has stated that senior foreign government officials commissioned these attacks. Attackers attempted to breach election offices in more than 20 other states. *See* Halderman Aff. ¶ 7 & Ex. F.

Eight senators on the Senate Intelligence committee were so concerned about this issue that press reports from this week reveal that they wrote to President Obama imploring him to declassify and release to the public "additional information" "concerning the Russian government and the US election." Spencer Ackerman, *Senators call for declassification of files on Russia's role in US election*, The Guardian, December 1, 2016, https://www.theguardian.com/us-news/2016/nov/30/senators-hint-russian-interference-us-presidential-election.

Michigan would have been a "logical target" for potential cyberattackers. Wallach Aff. ¶ 8. Cyberattackers "know about 'battleground states,'" as polling data before the elections make clear, and "can focus their efforts on states where a small nudge might have a large impact." *Id.*; *see also* Rivest Aff. ¶ 31 ("when the election is close (as MI appears to be), changing just a few votes in every precinct may suffice to swing the election").

3.    **The Number of Ballots Discarded as Undervotes Raises Grave Concerns that the Certified Results are Inaccurate**

Michigan's unusual election results also raise red flags regarding potential interference with election results. Of the 4,874,619 votes cast in Michigan in November, over 75,000 did not record any vote for the office of president when the voting machines scanned them. *See* 2016 Michigan Election results, http://miboecfr.nictusa.com/election/results/2016GEN_CENR.html; *see also* Vora Aff. ¶ 20. This discrepancy between total votes cast and votes cast for president—known as the

13

"undervote"—represents 1.5% of the total vote in the state, and it is substantially higher than in recent presidential election years. The 75,335 undervotes are 50% more than the number of undervotes in 2012, though there are less than 2% more voters this year, Vora Aff. ¶ 20, and there are 41% more undervotes than in 2000, Affidavit of Philip B. Stark ("Stark Aff."), ¶ 20. The number of undervotes also dwarfs the 10,704 margin between the top two candidates.

The unexplained increase in the undervote alone is enough to raise the possibility that a tabulation error, including a cyberattack, affected at the tabulation process. While there are several possible explanations for any such error, ranging from the benign (scanner malfunction) to the malicious (intentional tampering), absent a recount, every voter in Michigan is left to wonder whether her ballot was ignored because she used pen instead of pencil, did not shade an oval in dark enough, or was the victim of a hack. *See* Jones Aff. ¶¶ 15-23. A full-state, manual recount is the only way to determine whether the undervote is a true undervote—and not an error. And because the undervote is approximately seven times the Michigan presidential voter margin (under 11,000), verifying that the undervote is accurate through a hand recount may well change the outcome of the election. *See* Vora Aff. ¶ 20.

**4.     A Recount is Necessary to Restore Confidence in Michigan's Election Results and Safeguard Its Citizens' Right to Have their Votes Counted**

"Trust but verify." Rivest Aff. ¶ 30 (quoting President Ronald Reagan). According to a recent Washington Post-ABC News Poll, 18% of Americans surveyed—and 33% of supporters of Democratic Party candidate Hillary Clinton—do not accept Republican candidate Donald Trump's election as legitimate. Scott Clement, *One-third of Clinton supporters say Trump election is not legitimate, poll finds*, The Washington Post, November 13, 2016, https://www.washingtonpost.com/news/the-fix/wp/2016/11/13/one-third-of-clinton-supporters-say-trump-election-is-not-legitimate-poll-finds/. As Professor Rivest explains, "For

14

our democracy to work well, election systems should produce the best and most convincing evidence that announced election outcomes are correct. One should ask: what will it take to convince a skeptical supporter of a losing candidate that they really lost? Evidence of the form, 'You must trust the computer here.' is not likely to be adequate (nor should it be)." Rivest Aff. ¶ 20.

A recount is needed to shore up citizens' confidence that their votes were not systematically disregarded. Because the recorded margin between the president-elect and the second-place candidate in Michigan was just 10,704 votes, errors in the interpretation or tabulation of *less than 0.11 percent* of the votes cast could have caused an alternate result. Stark Aff. ¶ 19. The "amount of error required to alter the outcome can easily be less than the error that an optical scan system makes in accurately tabulating" valid votes (as defined by Michigan law). *Id.* ¶ 36.

Michigan uses optical scan voting machines that allow the voter to fill out a paper ballot that is scanned and counted by a computer. The good news for Michigan voters—and, unfortunately, this is not true in all of this nation's states—is that those paper ballots are physical evidence that is not vulnerable to cyberattack. Reviewing those paper ballots is the only way to determine whether a cyberattack affected the outcome of the 2016 presidential election. It is the only way to verify which candidate won the most Michigan votes. It is the only way to ensure that the votes cast by actual voters match the results determined by the computers. Halderman Aff. ¶¶ 22-24. If the paper ballots are not examined, any unintentional software bugs, intentional alterations to the vote or to the tally, or procedural errors leading to an incorrect election outcome will not be detected. *Id.*

15

A manual recount is the best way, and indeed the only way, to ensure public confidence that their votes were treated equally and counted, untainted by interference. Moreover, Michigan is well-placed to accurately perform such a recount because it has promulgated uniform "[r]ules for… human interpretation of hand marked ballots" that are models for other localities.  Jones Aff. ¶ 34.

A recount "will [also] set a precedent that will provide an important deterrent against cyberattacks on future elections."  Halderman Aff. ¶ 30; *see also* Wallach Aff. ¶ 7 ("The mere *possibility* of a recount or audit of the paper ballots acts as a deterrent to an electronic attack; it's much more difficult to tamper with paper, in bulk, relative to the effort to temper with purely electronic records as used in many states (but not Michigan)."); Rivest Aff. ¶ 36 ("It is important to emphasize that an audit or a recount really *must* look at the paper ballots.  Otherwise one is not examining the primary election data (the cast ballots themselves) but only derivative secondary data that may have been corrupted by faulty or malicious software.").

## II.     PLAINTIFFS WILL SUFFER IRREPARABLE HARM IN THE ABSENCE OF PRELIMINARY RELIEF

If injunctive relief is not granted, the recount will not be completed before the safe harbor deadline, and, as the Michigan Attorney General has warned, Michigan may not be able to seat its electors.  The result will be to deprive Michigan voters of their fundamental right to vote, as well the due process and equal protection of the laws guaranteed by Fourteenth Amendment.  An entire state of voters will be disenfranchised.  There is no greater irreparable harm.

Irreparable harm ordinarily exists when claims are based on violations of plaintiffs' constitutional rights. *Overstreet v. Lexington-Fayette Urban County Gov't*, 305 F.3d

16

566, 578 (6th Cir. 2002); *see also Obama for Am.*, 697 F.3d at 436 ("When constitutional rights are threatened or impaired irreparable injury is presumed.").

Abridgement of the right to vote, however, is a particularly acute constitutional violation that constitutes irreparable injury *per se*. *Elrod v. Burns*, 427 U.S. 347, 373 (1976); *see also Touchston v. McDermott*, 234 F.3d 1133, 1158-59 (11th Cir. 2000) ("[B]y finding an abridgement to the voters' constitutional right to vote, irreparable harm is presumed and no further showing of injury need be made."); *Sw. Voter Registration Educ. Project v. Shelley*, 344 F.3d 882, 907 (9th Cir. 2003) ("Abridgement or dilution of a right so fundamental as the right to vote constitutes irreparable injury.") (citation and internal quote marks omitted); *Williams v. Salerno*, 792 F.2d 323, 326 (2d Cir. 1986) (concluding that unjustified infringement of the right to vote constitutes "irreparable harm"); *Miller v. Blackwell*, 348 F. Supp. 2d 916, 922 (S.D. Ohio 2004) ("Because this Court has found that the Defendants' challenged actions threaten to impair both Plaintiffs' constitutional right to due process and constitutional right to vote, the Court must find that Plaintiffs will suffer an irreparable injury if the temporary restraining order does not issue.").

Ensuring that Michigan's recount is completed prior to the safe harbor date is the only way to prevent irreparable harm to every voter in this State.

## III.   PRELIMINARY RELIEF WILL NOT HARM OTHERS

There will be no harm to Defendants or anyone else if the recount proceeds shortly. Objections to Plaintiff Stein's petition for a recount have already been heard and ruled upon. There is no harm to the State or to voters, either. In fact, both will be harmed if injunctive relief is *not* granted because the voters of Michigan will be effectively disenfranchised in a presidential election.

## IV.   ENJOINING UNNECESSARY DELAY OF THE RECOUNT SERVES THE PUBLIC INTEREST

The injunctive relief sought here serves the highest public interest. "Members of the public . . . have a 'strong interest in exercising the fundamental political right to vote.' That interest is best served by favoring enfranchisement and ensuring that qualified voters' exercise of their right to vote is successful." *Hunter v. Hamilton Cnty. Bd. of Elec.*, 635 F.3d 219, 244 (6th Cir. 2011) (citing *Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006)). Moreover, "it is always in the public interest to prevent violation of a party's constitutional rights." *Déjà Vu of Nashville, Inc.*, 274 F.3d at 400 (internal quotes omitted).

Finally, the "injunction will also serve the public interest in the integrity of local government," *see Bryanton v. Johnson*, 902 F. Supp. 2d 983, 1004 (E.D. Mich. 2012), by ensuring that state laws do not interfere with fundamental constitutional rights.

## V.   THE COURT SHOULD NOT REQUIRE A BOND

The rule in the Sixth Circuit "has long been that the district court possesses discretion over whether to require the posting of security" under Rule 65(c). *Moltan Co. v Eagle-Picher Indus., Inc.*, 55 F.3d 1171, 1176 (6th Cir. 1995). Here, no bond is appropriate because of the strength of Plaintiffs' case on the merits "and the strong public interest involved." *See id.*; *see also Cole v. ArvinMeritor, Inc.*, 516 F. Supp. 2d 850, 879 (E.D. Mich. 2005) (issuing preliminary injunction without bond after considering in light of likelihood of success on the merits, public interest, and other factors). Indeed, conditioning the recognition of Michiganders' franchise on Plaintiffs' ability to post bond would be perverse, especially since the Stein campaign has already paid nearly a million dollars in statutorily required fees for the now-delayed recount. *See* Brewer Decl. Ex. 16. Accordingly, the Court should dispense with requiring a bond under the circumstances.

18

**CONCLUSION**

For the foregoing reasons, Plaintiffs respectfully request that the Court grant their motion for a temporary restraining order and preliminary injunction.

Dated: December 2, 2016
       Southfield, Michigan

GOODMAN ACKER, P.C.

_____/s/ Mark Brewer_____

Mark Brewer (P35661)
17000 W. Ten Mile Road, 2nd Floor
Southfield, MI 48075
(248) 483-5000
mbrewer@goodmanacker.com

*Attorneys for Plaintiffs*